# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DSM IP ASSETS, B.V.; DSM PURITY, B.V.; DSM BIOMEDICAL, B.V.; & DSM BIOMEDICAL, INC.

        Plaintiffs,

        v.

HONEYWELL INTERNATIONAL, INC.

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 23-cv-00675 (WCB)

**<u>JURY TRIAL DEMANDED</u>**

█████████████

████████████

**THE DSM PLAINTIFFS' OPENING BRIEF IN SUPPORT OF THEIR MOTIONS TO DISMISS UNDER FED. R. CIV. P. 12(B)(1) & 12(B)(6) AND, IN THE <u>ALTERNATIVE, TO STAY DEFENDANT'S COUNTERCLAIMS</u>**

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
500 Delaware Avenue
Suite 1500
Wilmington, DE 19801
Tel: (302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Plaintiffs DSM IP Assets, B.V.; DSM Purity, B.V.; DSM Biomedical, B.V.; & DSM Biomedical Inc.*

Dated: January 11, 2024

**<u>TABLE OF CONTENTS</u>**

**Page**

I. NATURE AND STAGE OF THE PROCEEDINGS ................................................................ 1

II. SUMMARY OF ARGUMENT ................................................................ 2

III. STATEMENT OF THE FACTS ................................................................ 3

IV. LEGAL STANDARD ................................................................ 5

V. BECASUSE HONEYWELL LACKS STANDING, COUNTERCLAIMS 2-6
SHOULD BE DISMISSED FOR LACK OF SUBJECT-MATTER JURISDICTION ................ 6

    A.    Honeywell's Allegations of Injury Are Conclusory ............................................. 6

    B.    Honeywell Fails to Allege But-For Causation ...................................................... 8

VI. HONEYWELL'S COUNTERCLAIMS SHOULD BE DISMISSED FOR FAILURE
TO STATE A PLAUSIBLE CLAIM FOR RELIEF ...................................................... 10

    A.    Honeywell Has Failed to Allege Facts Plausibly Showing Non-
Infringement ...................................................................................................... 10

    B.    The *Noerr-Pennington* Doctrine Protects DSM's Patent Suit and Related
Communications ................................................................................................. 11

    C.    Honeywell's Failure to Allege that DSM's Indirect-Infringement Claim
Was a Sham Concedes that the Action Is Immune Under *Noerr-
Pennington* ....................................................................................................... 12

    D.    Honeywell Failed to Plead Facts Showing that DSM's Complaint Was
Objectively Baseless ......................................................................................... 13

    E.    Honeywell Failed to Plead Facts Showing that DSM Brought its Suit in
Subjective Bad Faith ......................................................................................... 15

    F.    Honeywell's State Law Claims Also Are Barred by *Noerr-Pennington* .............. 17

    G.    Honeywell's Counterclaims Under North Carolina Law Fail Because
Delaware Law Applies ...................................................................................... 18

VII. ALTERNATIVELY, HONEYWELL'S COUNTERCLAIMS 2-6 SHOULD BE
BIFURCATED AND STAYED ...................................................................................... 19

VIII. CONCLUSION ...................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adam v. Barone*,
    41 F.4th 230 (3d Cir. 2022) ...................................................................................6

*Apotex, Inc. v. Senju Pharm. Co.*,
    921 F. Supp. 2d 308 (D. Del. 2013).....................................................................20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).........................................................................5, 6, 7, 10

*Avaya Inc., RP v. Telecom Labs, Inc.*,
    838 F.3d 354 (3d Cir. 2016)................................................................................12

*Ballentine v. United States*,
    486 F.3d 806 (3d Cir. 2007)) ...............................................................................5

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................5, 7, 10

*British Telecoms. PLC v. IAC/InterActiveCorp.*,
    381 F.Supp.3d 293 (D. Del. 2019).......................................................................5

*California v. Texas*,
    141 S.Ct. 2104 (2021)...........................................................................................6

*California Motor Transport Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972)............................................................................................11

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
    168 F.3d 119 (3d Cir. 1999)...............................................................................18

*City of Columbia v. Omni Outdoor Advert., Inc.*,
    499 U.S. 365 (1991).....................................................................................12, 15

*Clapper v. Amnesty Intern. USA*,
    568 U.S. 398 (2013)..............................................................................................8

*Clemens v. ExecuPharm Inc.*,
    48 F.4th 146 (3d Cir. 2022) ..................................................................................8

*Constitution Party of Penn. v. Aichele*,
   757 F.3d 347 (3d Cir. 2014)..................................................................................2, 5, 6

*Corning Inc. v. SRU Biosys., LLC*,
   292 F.Supp.2d 583 (D. Del. 2003)..........................................................................18, 19

*De Lage Landen Fin. Servs., Inc. v. Miramax Film Corp.*,
   No. 06-2319, 2009 WL 678625, at *6-7 (E.D. Pa. Mar. 16, 2009) .........................10

*Diamond v. Reynold*,
   No. 84-280, 1986 U.S. Dist. LEXIS 30514, at *9 (D. Del. Jan. 13, 1986).............18

*Duke Univ. v. Akorn, Inc.*,
   No. 3:18-cv-14035-BRM-TJB, 2019 WL 4410284, at *7
   (D.N.J. Sept. 16, 2019) ...........................................................................................20

*Eagle Pharms., Inc. v. Eli Lilly & Co.*,
   No. 18-1121-MSG, 2018 WL 6201704, at *2 n. 3 (D. Del. Nov. 27, 2018). ..................19, 20

*Eastern Railroad Conference v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961)..................................................................................................11

*Enzo Life Sciences, Inc. v. Adipogen Corp.*,
   82 F. Supp. 3d 568 (D. Del. 2015)...........................................................................18

*Fed. Trade Comm'n v. AbbVie Inc.*,
   976 F.3d 327 (3d Cir. 2020)......................................................................................16, 17

*Finkelman v. Nat'l Football League*,
   810 F.3d 187 (3d Cir. 2016)......................................................................................8

*Greenberg v. Haggerty*,
   491 F.Supp.3d 12 (E.D. Pa. 2020). ..........................................................................9

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*,
   343 F.Supp.2d 272 (D. Del. 2004), *aff'd*, 488 F. 3d 982 (Fed. Cir. 2007) .............17

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010)......................................................................................5

*In re Remicade Antitrust Litig.*,
   345 F.Supp.3d 566 (E.D. Pa. 2018) .........................................................................13

*In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*,
   No. 20-1076-CFC, 2022 WL 2438934, at *7 (D. Del. July 5, 2022) .......................5

*In re Neurontin Antitrust Litig.*,
    No. 1479, 2009 WL 2751029 at *7 (D.N.J. Aug. 28, 2009)....................................13

*Indivior Inc. v. Alvogen Pine Brook LLC*,
    No. 17-7106, 2023 WL 6936749, at *14 (D.N.J. July 10, 2023)...........................20

*Indus. Models, Inc. v. SNF, Inc.*,
    716 F. App'x 949 (Fed. Cir. 2017) ......................................................................12

*Klaxon Co. v. Stentor Elec. Mfg. Co*.,
    313 U.S. 487 (1941)...............................................................................................18

*Miller Indus. Towing Equip. Inc. v. NRC Indus.*,
    659 F.Supp.3d 451 (D.N.J. 2023). ..............................................................5, 14, 15

*Nuance Commc'ns, Inc. v. MModal LLC*,
    No. 17-1484-MN-SRF, 2018 WL 6804488 at *2 (D. Del. Dec. 27, 2018) ............18

*Reilly v. Ceridian Corp.*,
    664 F.3d 38 (3d Cir. 2011)......................................................................................8

*Pendergrass v. Pendergrass*,
    No. 18-478, 2019 WL 9100189 ...............................................................................7

*PennPac Intern., Inc. v. Rotonics Mfg., Inc.*,
    No- 99-CV-2890, 2001 WL 569264, at *9 (E.D. Pa. May 25, 2001)....................12

*Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus, Inc.*,
    508 U.S. 49 ("*PRE*")........................................................................................11, 16

*SSI Techs., LLC v. Dongguan Zhengyang Elec. Mech. Ltd.*,
    59 F.4th 1328 (Fed. Cir. 2023). ......................................................................15, 18

*Takeda Pharm. Co. Ltd. v. Zydus Pharms. (USA) Inc.*,
    358 F.Supp.3d 389 (D.N.J. 2018) .....................................................................14, 20

*Travelers Indemnity Co. v. Lake*,
    594 A.2d 38 (Del. 1991). .......................................................................................18

*TSMC Tech., Inc. v. Zond, LLC*,
    No. 14-721-LPS-CJB, 2015 U.S. Dist. LEXIS 1834..............................................9

*United Mine Workers v. Pennington*,
    381 U.S. 657 (1965)...............................................................................................11

*Upper Gwynedd Equities, LLC v. Provco Pinegood Sumnytown, LLC*,
    No. 20-cv-2819-JMY, 2022 WL 16927795, at *3 (E.D. Pa. Nov. 14, 2022).........18

**Statutes**

15 U.S.C. § 2 ............................................................................................................................1

**Other Authorities**

Fed. R. Civ. P. 12(b)(1) ...........................................................................................................1

Fed. R. Civ. P. 12(b)(6) ...........................................................................................................1

## I.     NATURE AND STAGE OF THE PROCEEDING

The DSM Plaintiffs (collectively, "DSM") sued Honeywell International, Inc. ("Honeywell"), accusing its blue-colored, medical-grade ultra-high molecular weight polyethylene ("UHMWPE") yarns of directly and indirectly infringing U.S. Patent No. 10,280,532 (the "'532 patent"). (D.I. 1). Based on an allegedly clear-cut noninfringement defense, Honeywell filed a motion to dismiss, which the Court mostly denied. (D.I. 13-14; D.I. 24). During argument on the motion to dismiss, the Court advised that if Honeywell has "an ironclad defense against infringement," then it "would be in everybody's interest" for Honeywell to provide DSM with the relevant factual information to "save a lot of money[.]" (Ex. 1 at 19:22-21:17).

An accused infringer with an "ironclad" noninfringement defense to a straightforward infringement claim involving a limited number of patents and accused products should have every incentive to resolve the dispute early. Not Honeywell. More than six months after the Complaint was served, Honeywell still has not provided any detailed explanation to substantiate its alleged noninfringement defense – not directly to DSM, and now, not in its counterclaims against DSM under section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and Delaware and North Carolina state tort law, alleging that DSM's direct infringement claim is a sham.

Honeywell's failure to allege facts addressing the merits of DSM's infringement claims is just one of the bases on which DSM now moves to dismiss the counterclaims pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Alternatively, DSM moves that the Court bifurcate and stay the counterclaims pending the resolution of its infringement claims, whose resolution could also resolve the counterclaims without the additional expense of antitrust-specific discovery, motion practice, and trial.

16495323/1

## II.    SUMMARY OF ARGUMENT

Honeywell has failed to allege facts that, if proven, would establish the Court's jurisdiction and entitlement to relief. Its counterclaims should be dismissed for four reasons.

1. The Court lacks subject-matter jurisdiction over Counterclaims 2-6 because Honeywell lacks Article III standing; it has failed to allege that it has suffered an injury-in-fact "fairly traceable" to the defendant's allegedly unlawful conduct. *Constitution Party of Penn. v. Aichele*, 757 F.3d 347, 358, 366 (3d Cir. 2014). In this regard, Honeywell's counterclaims assert only that one third-party customer paused its evaluation of Honeywell's accused products, which *might* have led to a purchase, because it learned of this lawsuit. This conclusory and speculative assertion is insufficient to establish the Court's jurisdiction.

2. Honeywell's counterclaim for a declaratory judgment of non-infringement should be dismissed because Honeywell has failed to allege any facts plausibly showing non-infringement.

3. Assuming that the Court has subject-matter jurisdiction over it, Counterclaim 2 is barred by *Noerr-Pennington* antitrust immunity. The *Noerr-Pennington* doctrine bars antitrust claims premised on litigation-related conduct unless they fit within a narrow exception for "sham" litigation. To qualify for that exception, Honeywell's antitrust counterclaim must challenge all of DSM's complaint, alleging facts that, if proven, would establish both that DSM's entire complaint is objectively baseless and that DSM brought it in subjective bad faith. Honeywell fails all three of these requirements: Honeywell challenges only one of DSM's two infringement claims, and alleges no facts that establish either objective baselessness or subjective bad faith. DSM's suit is thus immune from federal antitrust liability.

4. For similar reasons, Honeywell's related state law Counterclaims 3-6 also must be dismissed. Binding circuit precedent makes clear that the same First Amendment principles that protect non-sham litigation from federal antitrust liability apply equally to state law claims based

on that litigation. In addition, Honeywell's North Carolina claims must be dismissed because Delaware law, not North Carolina law, applies to any dispute between these parties.

Alternatively, were the Court to decide that Counterclaims 2-6 are adequately pleaded, they should be bifurcated and stayed pending resolution of DSM's underlying patent claims. Bifurcation and a stay would streamline the case and avoid needless expense on potentially unnecessary antitrust discovery.

## III.   STATEMENT OF THE FACTS

DSM and Honeywell make and sell competing blue, medical-grade UHMWPE yarns. (D.I. 31 at Ans. ¶ 42). DSM owns the '532 patent, which claims colored multi-filament yarns having certain compositional features, including UHMWPE filaments made by a gel-spinning process. (D.I. 1-1). DSM sued Honeywell for infringing the '532 patent. (D.I. 1). The '532 patent claims priority to U.S. Patent No. 9,506,168 (the "'168 patent"). (Ex. 2). The '168 patent claims colored sutures made of UHMWPE multi-filament yarns similar to those claimed in the '532 patent. (*Id.*). DSM has not yet asserted the '168 patent against Honeywell because (i) to DSM's knowledge, Honeywell does not manufacture medical sutures and (ii) at the time of the Complaint, DSM was not yet aware of any third-party that had used Honeywell's accused yarns to manufacture a suture.

The parties' competing blue-colored UHMWPE yarns are manufactured using gel-spinning processes. (D.I. 1 at ¶¶ 21, 31, 44). The parties' customers, themselves medical device manufacturers, have these yarns transformed by machine to braid them into end-use products such as, for example, medical sutures and anchors used in specialized orthopedic surgeries. (*See* D.I. 31 at Countercl. ¶ 37). These manufacturing processes may introduce low levels of residual processing aids in both the yarn and end-use sutures, which are undesired for implantable devices. Consequently, as industry practice, and to comply with FDA regulations, the parties' customers must have the sutures washed in a process called "scouring" to remove any impurities prior to

sterilization and implantation of the finished product. (*See* D.I. 31 at Countercl. ¶¶ 37-38 (noting that UHMWPE fibers and additives must comply with FDA regulations)). As Honeywell knows, the parties' customers must and do employ such a scouring process.

Honeywell's entire allegations about the merits of DSM's direct infringement claim consist of two conclusions: that its accused products "do not include the specific limitations of the claims that DSM had to add during prosecution of its patent at the USPTO in order to avoid the disclosure of the prior art" (D.I. 31 at Countercl. ¶ 22), and that "Honeywell does not make, use, sell, or offer to sell any product that practices every element of any claim of the '532 patent[.]" (D.I. 31 at Countercl. ¶ 58). Honeywell alleges nothing about how its accused products do not directly infringe. And the counterclaims do not even attempt to assert that, once scoured by a medical device manufacturer ███████, the accused products do not directly infringe the yarn claims of the '532 patent or the suture claims of the '168 patent.

Honeywell's allegations about its purported injury involve ████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████ Although Honeywell also asserts that other unnamed customers received "similar letters" and "were encouraged to refrain from purchasing Honeywell's" products (*id.* ¶¶ 33-34), it alleges nothing about the effect of such encouragement on any other customer.

## IV.    <u>LEGAL STANDARD</u>

"When deciding a motion to dismiss a crossclaim or counterclaim under [Rule] 12(b)(6),

the Court undertakes the same analysis as it would for claims in a complaint." *Miller Indus. Towing*

*Equip. Inc. v. NRC Indus.*, 659 F.Supp.3d 451, 461 (D.N.J. 2023).  Rule 12(b)(6) requires that a

complaint "contain sufficient factual matter accepted as true, to 'state a claim for relief that is

plausible on its face.'" (D. I. 24 at 5 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))); *see*

*also, e.g.*, *British Telecoms. PLC v. IAC/InterActiveCorp.*, 381 F.Supp.3d 293, 299-300 (D. Del.

2019) (Bryson, J.).  The same standard applies to DSM's motion to dismiss Honeywell's

counterclaims under Rule 12(b)(1) for lack of subject-matter jurisdiction. *Constitution Party*, 757

F.3d at 358 (a defendant's "facial attack" on the pleading's sufficiency to allege jurisdiction "calls

for a district court to apply the same standard of review it would use in considering a motion to

dismiss under Rule 12(b)(6)").  As the party invoking the Court's remedial powers, Honeywell

"bears the burden of establishing the elements of standing, and each element must be supported in

the same way as any other matter on which [it] bears the burden of proof." *In re Seroquel XR*

*(Extended Release Quetiapine Fumarate) Antitrust Litig.*, No. 20-1076-CFC, 2022 WL 2438934,

at \*7 (D. Del. July 5, 2022) (quoting *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007)).

The "practical concerns" about costly discovery based on flimsy allegations that underly

this standard are particularly salient in "big cases" like "antitrust cases," as "the defendant should

not be put to the expense of big-case discovery on the basis of a threadbare claim." *In re Ins.*

*Brokerage Antitrust Litig.*, 618 F.3d 300, 370, 370 n. 67 (3d Cir. 2010) ; *see also, e.g.*, *Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (recognizing unusually high cost of antitrust

discovery and enforcing pleading standards "lest a plaintiff with a largely groundless claim be

allowed to take up the time of a number of other people, with the right to do so representing an *in*

*terrorem* increment of the settlement value") (cleaned up).

## V. BECAUSE HONEYWELL LACKS STANDING, COUNTERCLAIMS 2-6 SHOULD BE DISMISSED FOR LACK OF SUBJECT-MATTER JURISDICTION

"Only a party with standing can invoke the jurisdiction of the federal courts." *Constitution Party*, 757 F.3d at 357. Thus, before reaching Honeywell's counterclaims under Rule 12(b)(6), the Court must assure itself of subject-matter jurisdiction, which "includes the requirement that litigants have standing." *California v. Texas*, 141 S.Ct. 2104, 2113 (2021). Here, because Honeywell has not alleged facts that plausibly establish Article III standing, the Court lacks subject-matter jurisdiction over Counterclaims 2-6 and should dismiss them under Rule 12(b)(1).

Article III standing requires a plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Adam v. Barone*, 41 F.4th 230, 233-34 (3d Cir. 2022) (internal quotation marks omitted).[1] The plaintiff must plead facts showing that the defendant's complained-of actions were a "but-for" cause of its injuries – that the "injury would not have occurred without the [defendant's] alleged action or event." *Id*. at 235, 235 n.5. Honeywell's allegations of injury fail to establish Article III standing, and thus subject-matter jurisdiction, over Counterclaims 2-6 for two reasons. First, they are conclusory, and thus "not entitled to be assumed true" to begin with. *Iqbal*, 556 U.S. at 680-81. Second, even if credited, they fail to show that DSM's allegedly anticompetitive conduct was the but-for cause of Honeywell's alleged injury.

### A. Honeywell's Allegations of Injury Are Conclusory

Honeywell's entire injury rests on the allegation that *one* customer, ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[1] Because the analysis for Rule 12(b)(6) motions is the same for claims and counterclaims, we use the term "plaintiff" for brevity.

████████████████████████████████████████████████ Honeywell's counterclaims thus rely entirely

on ███████████████. But Honeywell pleads no facts that make it plausible that ██████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ or any of the myriad reasons

why customers stick with tried-and-tested suppliers over new and unproven alternatives. Instead,

Honeywell offers only the bare conclusions that ████████████  ████████████████████

█████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Notably, although

Honeywell presumably was in contact with ████████, it does not allege a single communication

between them, let alone one in which █████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

████████████████████████████████████

   That is not enough to show a causal connection. Like other "conclusory statements"

supporting "threadbare recitals of a cause of action's elements," bare allegations regarding an

entity's motivations are not entitled to credit at the motion to dismiss stage. *See Iqbal*, 556 U.S. at

680-81 (allegation that defendants "knew of, condoned, and willfully and maliciously agreed to

subject" respondent to unconstitutional conditions was "conclusory and not entitled to be assumed

true" on motion to dismiss) (citing *Twombly*, 550 U.S. at 554-556); *Pendergrass v. Pendergrass*,

No. 18-478, 2019 WL 9100189, at *4 (E.D. Pa. Jan. 31, 2019) ("conclusory statements relating to

[third party's] motivations, without pertinent factual allegations, do not permit the court to infer

more than the mere possibility of misconduct") (internal quotation marks omitted). To establish causation, Honeywell thus needed to plead facts which, if proven, would plausibly show that ████████████████████████████████████████████████████████████ It did not: ████████████████████████████████████████████████████ ████████████ Honeywell's resulting failure to establish Article III standing requires dismissal of Counterclaims 2-6 for lack of subject-matter jurisdiction.

### B.    Honeywell Fails to Allege But-For Causation

Even if Honeywell had adequately pleaded that DSM's alleged conduct caused any of its customers to pause its qualification process because of DSM's suit, the allegations would fail because they ignore independent factors that would disrupt the causal chain. Article III standing requires that the plaintiff's injury be "fairly traceable to the challenged action of the defendant, and not the independent action of some third party not before the court." *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016); *see also Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 414 n.5 (2013) (explaining that "Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the court" and instead "bear the burden of pleading and proving concrete facts showing that the defendant's actual action" caused their injury).[2] Honeywell thus needed to allege "a realistic danger of sustaining a direct injury"—not "that it is literally certain that the harms [it] identif[ies] will come about," but more than an "objectively reasonable likelihood" that those harms will occur. *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 152-53 (3d Cir. 2022) (quoting *Clapper*, 568 U.S. at 410, 414 n.5). Thus, for example,

---

[2]  The Third Circuit also has held that courts lack jurisdiction over claims involving independent third-party conduct because such claims "fail to allege an imminent injury-in-fact," as "one cannot describe how the plaintiffs will be injured without beginning the explanation with the word 'if.'" *Reilly v. Ceridian Corp.*, 664 F.3d 38, 43 (3d Cir. 2011) (cleaned up). This approach, too, means that the Court lacks jurisdiction over Counterclaims 2-6.

a lawyer who "intend[ed] to mention epithets, slurs, and demeaning nicknames" in a First Amendment CLE series had standing to challenge the Philadelphia bar's prohibition on language manifesting bias or prejudice, even though a listener would have to report him to the bar before any sanction could be imposed on him, because he cited specific examples of "individuals filing disciplinary and Title IX complaints" based on similar presentations. *Greenberg v. Haggerty*, 491 F.Supp.3d 12, 22-24 (E.D. Pa. 2020).

Honeywell fails this standard. First, Honeywell does not contend that DSM's indirect-infringement claim is a sham. Indeed, it does not mention that claim, much less allege a single fact showing that it does not indirectly infringe the '532 patent, or that the indirect-infringement claim wrongly caused ███████████████████████████████ *See TSMC Tech., Inc. v. Zond, LLC*, No. 14-721-LPS-CJB, 2015 U.S. Dist. LEXIS 1834, at *19-23 (D. Del. Jan. 8, 2015) (dismissing declaratory judgment counterclaims where allegations were conclusory and did not meet elements of non-inducement). Nor likely can it; whatever Honeywell's unspoken non-infringement theory may turn out to be, the end-product sutures made by its customers from Honeywell's yarn infringe the '532 patent's claims. *See* D.I. 31 at Countercl. ¶¶ 37-38. Absent factual allegations showing that Honeywell's customers' own independent use of the accused products could not infringe the '532 patent, the challenged *direct*-infringement claim could not have injured Honeywell any more than did the unchallenged *indirect*-infringement claim.

Moreover, ██████████████████████████████████████████████ ████████████████████████████████████, Honeywell alleges no causal injury. All Honeywell's but-for world would give it is the prospect that the customer would continue to the end of the evaluation process and then decide to purchase its accused products. But an allegation that a customer was motivated to evaluate Honeywell's product (D.I. 30 at Countercl.

¶ 30) does not mean the customer would have *finished* the process but for DSM's conduct – let alone that the customer would actually have made a purchase. This is particularly true where the customer uses the accused product in a manner that may subject itself to infringement risks independent of Honeywell's. Any of these customers might proceed with the qualification process only to decide, for reasons unrelated to this suit, not to go further; in that case, Honeywell's loss would have nothing to do with DSM's alleged misconduct. No allegations make it plausible that Honeywell would have cleared these hurdles.

Thus, the theory that, but for DSM's suit, any customer might have qualified Honeywell's accused product and bought it is entirely speculative. Because it did not plead facts plausibly showing that ███████ or other customers (1) *would* have switched to it absent this suit but (2) *will not* do so now that DSM has alerted them of its alleged infringement, Honeywell fails to allege Article III standing. The Court therefore lacks subject-matter jurisdiction over Counterclaims 2-6.

## VI.    HONEYWELL'S COUNTERCLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A PLAUSIBLE CLAIM FOR RELIEF

### A.    Honeywell Has Failed to Allege Facts Plausibly Showing Non-Infringement

As shown above, Honeywell has utterly failed to allege facts showing that its accused products do not infringe the '532 patent, whether directly or indirectly. Its denial that it "make[s], use[s], sell[s] or offer[s] to sell" an infringing product (D.I. 31 at Countercl. ¶ 58) is a "mere conclusory statement[]" about a cause of action's elements. *Iqbal*, 556 U.S. at 678. A "formulaic recitation of the elements of a cause of action will not do" any more in a counterclaim than in a complaint. *Twombly*, 550 U.S. at 555. Alternatively, the Court should dismiss the counterclaim because it only mirrors DSM's direct-infringement claim. *See De Lage Landen Fin. Servs., Inc. v. Miramax Film Corp.*, No. 06-2319, 2009 WL 678625, at *6-7 (E.D. Pa. Mar. 16, 2009) (court may dismiss declaratory judgment claims "as superfluous when it is clear that there is a 'complete

identity of factual and legal issues' such that they serve no 'useful purpose'"). Honeywell will have an opportunity to contest the merits of DSM's infringement claims in any event, but because it has failed to allege facts entitling it to a declaratory judgment and its counterclaim would serve no useful purpose in any event, Counterclaim 1 must be dismissed.

B.    **The *Noerr-Pennington* Doctrine Protects DSM's Patent Suit and Related Communications**

The Supreme Court has repeatedly recognized, in the *Noerr-Pennington* line of cases, that antitrust claims cannot be based on First Amendment-protected petitioning of government. *See, e.g.*, *Eastern Railroad Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961) ("[T]he Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly"); *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965) (holding that "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose"). The First Amendment also protects efforts to petition the courts for redress, because "[t]he right of access to the courts is indeed but one aspect of the right of petition." *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). Thus, the First Amendment protects the filing of a lawsuit like DSM's.

Claims against such lawsuits are thus barred, unless the litigation is a "'mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor.'" *Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus, Inc.*, 508 U.S. 49, 56 ("*PRE*") (quoting *Noerr*, 365 U.S. at 144). That exception requires proof that the complained-of lawsuit was "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," *and* that the suit is "'an attempt to interfere directly with the business relationships of a competitor,'" through the 'use of the governmental process—as opposed to the outcome of that

process—as an anticompetitive weapon.'" *Id*. at 60-61 (quoting *Noerr*, 365 U.S. at 144, and *City of Columbia v. Omni Outdoor Advert., Inc*., 499 U.S. 365, 380 (1991)); *see also Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 413-14 (3d Cir. 2016) (summarizing doctrine).

The same rule applies to communications sent concerning litigation. *See*, *e.g.*, *Indus. Models, Inc. v. SNF, Inc.*, 716 F. App'x 949, 955 (Fed. Cir. 2017) ("*Noerr-Pennington* immunity protects those acts reasonably and normally attendant upon effective litigation, including threats of litigation") (cleaned up); *PennPac Intern., Inc. v. Rotonics Mfg., Inc.*, No- 99-CV-2890, 2001 WL 569264, at *9 (E.D. Pa. May 25, 2001) (collecting cases on *Noerr* and notification letters).

### C.    Honeywell's Failure to Allege that DSM's Indirect-Infringement Claim Was a Sham Concedes that the Action Is Immune Under *Noerr-Pennington*

DSM's complaint includes two claims: one for direct infringement by Honeywell (D.I. 24 at 6) and another for "indirect infringement by inducing [Honeywell's] customers" to violate DSM's patent (*id*. at 12). Honeywell's counterclaims allege that DSM's direct infringement claim was baseless. (D.I. 31 at Countercl. ¶ 22 ("***Honeywell*** does not infringe the claims of the '532 patent"); *id*. ¶ 23 (DSM knew "that there is no legitimate claim that ***Honeywell's*** SPECTRA BIO Blue Products infringe the '532 patent"); *id*. ¶ 24 (DSM "did not conduct any meaningful diligence to determine whether ***Honeywell's product*** actually infringes the Asserted Patent," and "***Honeywell*** does not make, use, sell, or offer to sell any product that practices every element of any claim of the '532 patent") (emphasis added)). But it contains no comparable allegations about DSM's indirect infringement claim; the counterclaim does not even assert the *conclusion* that the indirect infringement claim is a sham, let alone plead facts sufficient to establish it.

Inducement is premised on direct infringement by a third party. Thus, Honeywell's allegation that it does not directly infringe the '532 patent is inapposite to DSM's inducement claim. To adequately allege that DSM's inducement claim was a sham, Honeywell needed to plead

facts demonstrating that Honeywell's *customers* would not infringe the '532 patent (or that Honeywell lacked the requisite intent for inducement) and that DSM knew as much. Honeywell did not. The absence of such factual allegations was not a simple oversight: Honeywell knows that its customers "scour" the accused products when converting them into end-use medical sutures to remove impurities.

Honeywell's failure to challenge the entire lawsuit is fatal to Counterclaims 2-6. "[F]or the sham exception to apply" to a multi-claim infringement suit, "'the whole case has to be a sham.'" *Avaya*, 838 F.3d at 413 (quoting district court). Thus, *Avaya* rejected a monopolization counterclaimant's "claim-by-claim" approach, under which one portion of a lawsuit could create antitrust liability regardless of the rest. *Id.* at 413-14. "Some of Avaya's claims . . . may have been weak," the court found, but "they were part and parcel of a course of litigation that proceeded to two months of substantial evidence and argument to a jury." *Id.* at 414. Avaya's suit therefore was "not a 'sham,'" and "was protected from antitrust liability by the *Noerr-Pennington* doctrine." *Id.*

Consequently, even if Honeywell's failure to challenge the indirect infringement claim as sham had not already prevented Article III standing, it would require dismissal of Counterclaims 2-6 under Rule 12(b)(6). And as shown below, the lack of factual allegations supporting a finding of sham litigation even as to the direct infringement claim would finish them off.

### D.    Honeywell Failed to Plead Facts Showing that DSM's Complaint Was Objectively Baseless

First, Honeywell fails to plead facts plausibly showing that DSM's suit was objectively baseless – that a reasonable litigant in DSM's position would have known prior to filing the suit that its claims were frivolous. *See, e.g.*, *In re Remicade Antitrust Litig.*, 345 F.Supp.3d 566, 582-83 (E.D. Pa. 2018) (dismissing "sham litigation allegation lack[ing] 'some reasonable particularity in pleading'") (quoting *In re Neurontin Antitrust Litig.*, No. 1479, 2009 WL 2751029 at *7 (D.N.J.

Aug. 28, 2009)). Honeywell barely even attempts to satisfy this standard. It asserts only that its accused products "do not include the specific limitations of the claims that DSM had to add during prosecution of its patent at the USPTO in order to avoid the disclosure of the prior art" (D.I. 31 at Countercl. ¶ 22), and, ironically parroting statutory and claim language, denies "make[ing], us[ing] or offer[ing] to sell" DSM's patented product (*id*. ¶ 24). But without pleading facts to support them, these "mere conclusory statements" simply "do not suffice." *Iqbal*, 556 U.S. at 678.

Honeywell's failure to allege any such facts might make sense if DSM's claims were *legally* baseless. But that ship has sailed: rejecting Honeywell's legal arguments, this Court has already found that DSM's remaining "allegations of direct infringement" were legally sufficient, which is why it denied Honeywell's motion to dismiss. (D.I. 24 at 12). Honeywell did not seek reconsideration of that decision. The Court's conclusion that DSM's complaint makes out a legally valid claim leaves Honeywell no way to claim that DSM's claim is legally objectively baseless.

Thus, the only route even potentially available to Honeywell would be to argue that DSM's complaint is *factually* baseless – in other words, that while the Court was required to credit DSM's factual allegations at the motion-to-dismiss stage, those statements were objectively baseless when DSM made them. Antitrust plaintiffs can plead facts sufficient to make that showing, by, for example, pointing to their "asserted efforts to bring [] deficiencies" in the patent claim to the antitrust defendant's attention, *Miller Indus. Towing Equip. Inc. v. NRC Indus.*, 659 F.Supp.3d 451, 464 (D.N.J. 2023), or to their pre-suit letters and/or certifications of non-infringement. *Takeda Pharm. Co. Ltd. v. Zydus Pharms. (USA) Inc.*, 358 F.Supp.3d 389, 397 (D.N.J. 2018). Honeywell, though, makes no allegation that it made facts known to DSM that would have put it on notice that Honeywell's product did not infringe and, in fact, has told the Court directly that "the time for that has passed[.]" (Ex. 1 at 20:3-5).

Indeed, Honeywell does not even allege any facts showing non-infringement in its counterclaims. Honeywell thus pleads no facts that, if proven, would establish that DSM's patent claim is even *incorrect*, let alone objectively *baseless*. Honeywell's failure in this regard is especially telling in light of the Court's prior conclusion that certain details relevant to DSM's patent claim are "readily known to the manufacturer" (Honeywell), and otherwise "peculiarly within [Honeywell's] knowledge or control." (D.I. 24 at 10). For example, Honeywell knows "the process" it uses "for manufacturing the accused products"; if the facts show that DSM's claims do not read on Honeywell's products, Honeywell's counterclaims easily could have alleged them specifically to put DSM on fair notice of Honeywell's alleged noninfringement theory. *Id.* Honeywell's evident inability to plead facts establishing that DSM's patent infringement claim is wrong, much less objectively baseless, confirms that its counterclaim should be dismissed.

### E.    Honeywell Failed to Plead Facts Showing that DSM Brought its Suit in Subjective Bad Faith.

"Objective baselessness must be established before the court may consider the subjective motivations of the patentee." *SSI Techs., LLC v. Dongguan Zhengyang Elec. Mech. Ltd.*, 59 F.4th 1328, 1337 (Fed. Cir. 2023). But even if Honeywell had alleged facts that supported a finding of objective baselessness, its antitrust claim is doomed by its failure to allege facts making it plausible that DSM filed this lawsuit in subjective bad faith – "'to interfere *directly* with the business relationships of a competitor,' *Noerr*, [365 U.S.] at 144 (emphasis added), through the 'use [of] the governmental *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon," *Omni,* [499 U.S.] at 380 (emphasis in original)." *PRE*, 508 U.S. at 60-61.

This standard "obviously places a heavy thumb on the scale in favor of granting protection" to antitrust defendants from sham-litigation claims. *Miller Indus. Towing Equip.,* 659 F.Supp.3d at 462. Honeywell might have addressed it by alleging, for instance, that DSM "was 'indifferent

to the outcome on the merits of the suit, whether any damages for infringement would be too low to justify investment in the suit, or whether [DSM] had decided to sue primarily for the benefit of collateral injuries inflicted through the use of legal process.'" *Fed. Trade Comm'n v. AbbVie Inc.*, 976 F.3d 327, 360-61 (3d Cir. 2020) (quoting *PRE*, 508 U.S. at 65-66)).

Here again, though, Honeywell has pleaded no such facts. It makes no allegation whatsoever suggesting that DSM is "indifferent to the outcome on the merits of the suit." *See PRE*, 508 U.S. at 65. Having seen DSM invest significant resources in defeating Honeywell's motion to dismiss its infringement claims, Honeywell does not, and cannot, plausibly suggest that DSM does not intend to seek relief from the Court on those claims. Similarly, Honeywell pleads no facts from which the Court could infer that DSM's claimed damages or protection of its profit and market share through injunctive relief would not justify DSM's costs in filing this suit. *See id.* Nor does it allege facts showing that DSM was suing primarily to impose "collateral injuries inflicted through the use of legal process", such as the sheer cost of litigation, to somehow drive Honeywell, a multi-billion dollar company, out of the market. *See id.*

To be sure, Honeywell offers conclusions – that DSM has sued "for the purpose of discouraging competition" (D.I. 31 at Countercl. ¶ 26) and "endeavors to eliminate and prevent competition" (*id.* ¶ 53) – showing that, like most any rational patent owner, DSM is serious about protecting its rights against infringers. But these allegations say nothing about subjective bad faith within the meaning of *PRE*. *Every* patent suit discourages a certain type of competition by protecting the patentholder's invention against infringers. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* § 2.1 (2017) (noting exclusionary intellectual property rights "help the owners to profit from the use of their property"). Condemning the desire to preserve the value of one's intellectual property rights by prevailing in

a patent suit as "bad faith" would render sham litigation's subjective prong a nullity. Honeywell thus needed to plead more: It needed to plead facts that, if proven, would show that DSM is using this suit not to obtain relief on a judgment of infringement, but merely as a tool to keep Honeywell out of the market through, *e.g.*, the "'collateral injuries inflicted through the use of legal process.'" *AbbVie Inc.*, 976 F.3d at 361 (quoting *PRE*, 508 U.S. at 66). Those facts are not present in the complaint, meaning that Honeywell has failed to adequately plead subjective bad faith.

Similarly, nothing in Honeywell's allegations about DSM's letters ▇▇▇▇ and other unidentified customers could establish subjective bad faith. Even if the entire lawsuit were objectively baseless, communications about it would not necessarily reflect subjective bad faith; a patentee might file a suit that, unknown to it, is objectively baseless, earnestly intending to obtain relief. Its communications about the suit, including notifications to the infringing defendant's customers, might well be exactly the same as the ones it would have issued had the case been meritorious, and their intended informational effect on customers and the defendant would be the same as well. And even in entirely well-grounded infringement actions, communications to third parties such as a defendant's customers are clearly meant to inform and possibly influence the recipients. Such an intent does not distinguish a letter relating to a sham litigation from a *Noerr*-protected letter relating to a non-sham case. Thus, even the fact that a patentee's letters were badly mistaken on the merits could not be probative of subjective bad faith. As Honeywell itself has successfully argued elsewhere, "patentees are permitted to make representations about their rights even though they are inaccurate." *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 343 F.Supp.2d 272, 326 (D. Del. 2004), *aff'd*, 488 F. 3d 982 (Fed. Cir. 2007).

### F.    Honeywell's State Law Claims Also Are Barred by *Noerr-Pennington*

Honeywell's state law claims are premised on the same conduct—DSM's filing of the underlying direct-infringement claim—as its federal antitrust claim. But "the same First

Amendment principles on which *Noerr-Pennington* immunity is based apply to [state] tort claims." *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128 (3d Cir. 1999) (applying *Noerr* to state business-tort claims); *see also, e.g.*, *Upper Gwynedd Equities, LLC v. Provco Pinegood Sumnytown, LLC*, No. 20-cv-2819-JMY, 2022 WL 16927795, at *3 (E.D. Pa. Nov. 14, 2022) (applying *Noerr-Pennington* to "state law tort claims . . . based on the same petitioning activity as the antitrust claims"); *Nuance Commc'ns, Inc. v. MModal LLC*, No. 17-1484-MN-SRF, 2018 WL 6804488 at *2 (D. Del. Dec. 27, 2018) (*Noerr-Pennington* "extends to business torts due to the doctrine's foundation on a First Amendment right of petition"); *see also SSI Techs.*, 59 F.4th at 1337. Thus, Honeywell's state law claims fail under *Noerr* just as Honeywell's federal claim does, and must be dismissed along with it.

### G.      Honeywell's Counterclaims Under North Carolina Law Fail Because Delaware Law Applies

Delaware law applies to this action; the North Carolina counterclaims thus should be dismissed with prejudice. "[A] federal court sitting in the District of Delaware . . . is bound to apply Delaware choice-of-law rules when deciding what law to apply in a state-law action." *Diamond v. Reynold*, No. 84-280, 1986 U.S. Dist. LEXIS 30514, at *9 (D. Del. Jan. 13, 1986) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487 (1941)). For tort actions, "Delaware courts apply the most significant relationship test." *Corning Inc. v. SRU Biosys., LLC*, 292 F.Supp.2d 583, 584 (D. Del. 2003) (citing *Travelers Indemnity Co. v. Lake*, 594 A.2d 38, 47 (Del. 1991)). That test requires the Court to consider "(1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the place of incorporation and principal place of business of the parties, and (4) the place where the relationship between the parties is centered." *Id*. at 584-85. These factors weigh strongly in favor of applying Delaware law here.

Honeywell admittedly is a Delaware corporation. (D.I. 31 at Countercl. ¶ 8). Thus, any alleged injury to Honeywell has occurred in Delaware. *See Enzo Life Sciences, Inc. v. Adipogen Corp.*, 82 F. Supp. 3d 568, 600 (D. Del. 2015) (finding party is injured in its state of incorporation). And because the alleged conduct giving rise to Honeywell's counterclaims was DSM's filing of its patent infringement action in this Court, the relationship between DSM and Honeywell as to the counterclaims is centered here in Delaware, not North Carolina. *See Corning*, 292 F. Supp. 2d at 585 ("[B]ecause Corning filed [its infringement suit] in Delaware, . . . Delaware is the place where the relationship between the parties is centered," and thus Delaware law governs tortious-interference counterclaim based on infringement suit against Massachusetts-domiciled defendant). None of the DSM plaintiffs is incorporated or has its principal place of business in North Carolina. (D.I. 31 at Countercl. ¶¶ 9-12). Moreover, Honeywell does not allege that any of the alleged communications about this litigation between DSM and ██████—the only customer Honeywell identifies in its counterclaims as giving rise to its purported injury—occurred in North Carolina. This is unsurprising, ████████████████████████████ ███████████████████████████████████████████████ █████████████████████████ Aside from Honeywell having its principal place of business in North Carolina, there is no relationship between Honeywell's counterclaims and North Carolina. Delaware law therefore applies to Honeywell's state-law counterclaims. Honeywell's North Carolina-based Counterclaims Four and Six should be dismissed with prejudice.

## VII.   ALTERNATIVELY, HONEYWELL'S COUNTERCLAIMS 2-6 SHOULD BE BIFURCATED AND STAYED

Should the Court conclude that not all of Honeywell's counterclaims 2-6 should be dismissed, the surviving counterclaims should be stayed, as is the "common practice" for dealing with an antitrust counterclaim in a patent case. *Eagle Pharms., Inc. v. Eli Lilly & Co.*, No. 18-

1121-MSG, 2018 WL 6201704, at *2 n. 3 (D. Del. Nov. 27, 2018). That practice would streamline this case; if DSM's claims prevail, then Honeywell's counterclaims will fail as a matter of law because DSM's claims could not have been objectively baseless. *See Apotex, Inc. v. Senju Pharm. Co.*, 921 F. Supp. 2d 308, 314-15 (D. Del. 2013). And even if DSM's claims failed, their resolution will yield information that courts frequently rely upon in finding or rejecting *Noerr-Pennington* immunity. *See, e.g.*, *Takeda Pharm.*, 358 F.Supp.3d at 396-97 (relying partly on "the parties' prior litigation history" to assess whether patent claim was a sham); *Indivior Inc. v. Alvogen Pine Brook LLC*, No. 17-7106, 2023 WL 6936749, at *14 (D.N.J. July 10, 2023) ("Plaintiffs' success at the district court level, combined with [a Federal Circuit] dissent agree[ing] with this Court's decision, 'destroys any notion that no reasonable litigant could realistically expect success'") (quoting *Duke Univ. v. Akorn, Inc.*, No. 3:18-cv-14035-BRM-TJB, 2019 WL 4410284, at *7 (D.N.J. Sept. 16, 2019) (same)). A stay thus may prevent unnecessary, "voluminous, time-consuming, and expensive" antitrust discovery. *Eagle Pharms.*, 2018 WL 6201704, at *3.

## VIII.  <u>CONCLUSION</u>

For the foregoing reasons, Honeywell's counterclaims should be dismissed; alternatively, Counterclaims 2-6 should be bifurcated and stayed pending resolution of DSM's patent suit.

Respectfully submitted,

Dated: January 11, 2024

**MORRIS JAMES LLP**

OF COUNSEL:

  */s/ Cortlan S. Hitch*

Erick J. Palmer
**MAYER BROWN LLP**
71 South Wacker Drive
Chicago, IL 60606
Tel: (312) 701-8352
ejpalmer@mayerbrown.com

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
500 Delaware Avenue
Suite 1500
Wilmington, DE 19801
Tel: (302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

Joseph A. Mahoney
Cecilia G. Rambarat
**MAYER BROWN LLP**
300 South Tryon Street
Suite 1800
Charlotte, NC 28202
Tel: (704) 444-3500
jmahoney@mayerbrown.com
crambarat@mayerbrown.com

*Attorneys for Plaintiffs DSM IP Assets, B.V.;
DSM Purity, B.V.; DSM Biomedical, B.V.; &
DSM Biomedical Inc.*

Christopher J. Kelly
**MAYER BROWN LLP**
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306
Tel: (650) 331-2025
cjkelly@mayerbrown.com

Exhibit 1

Page 1

1                 IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF DELAWARE

3        _____

4        DSM IP ASSETS, B.V., DSM PURITY,

5        B.V., DSM BIOMEDICAL, B.V. AND

6        DSM BIOMEDICAL, INC.,

7                 Plaintiffs,

8           v.                              Case No.

9        HONEYWELL INTERNATIONAL, INC.,        1:2023cv00675

10                Defendant.

11       _____

12                        TELEPHONIC HEARING

13       DATE:          Wednesday, November 1, 2023

14       TIME:          10:00 a.m.

15       BEFORE:        Honorable William C. Bryson

16       LOCATION:      Remote Proceeding

17                      Howard T. Markey National Courts

18                      Building

19                      717 Madison Place, Northwest

20                      Washington, DC 20439

21       REPORTED BY:   Andrew Weader

22       JOB NO.:       6290535

23

24

Page 2

```
 1              A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFFS DSM IP ASSETS, B.V., DSM
 3   PURITY, B.V., DSM BIOMEDICAL, B.V. AND DSM BIOMEDICAL,
 4   INC.:
 5        CORTLAN HITCH, ESQUIRE (by telephone)
 6        Morris James LLP
 7        500 Delaware Avenue, Suite 1500
 8        Wilmington, DE 19801
 9        chitch@morrisjames.com
10        302-888-6988
11
12        ERICK PALMER, ESQUIRE (by telephone)
13        Mayer Brown LLP
14        71 South Wacker Drive, Suite 3200
15        Chicago, IL 60606
16        ejpalmer@mayerbrown.com
17        650-843-5287
18
19
20
21
22
23
24
```

Page 3

1                A P P E A R A N C E S (Cont'd)

2    ON BEHALF OF PLAINTIFFS DSM IP ASSETS, B.V., DSM

3    PURITY, B.V., DSM BIOMEDICAL, B.V. AND DSM BIOMEDICAL,

4    INC.:

5            JOSEPH MAHONEY, ESQUIRE (by telephone)

6            CECILIA RAMBARAT, ESQUIRE (by telephone)

7            Mayer Brown LLP

8            214 North Tryon Street, Suite 3800

9            Charlotte, NC 28202

10           jamahoney@mayerbrown.com

11           crambarat@mayerbrown.com

12           312-701-8979

13           704-444-3553

14

15   ON BEHALF OF DEFENDANT HONEYWELL INTERNATIONAL, INC.:

16           RODGER SMITH, ESQUIRE (by telephone)

17           Morris, Nichols, Arsht & Tunnell LLP

18           1201 North Market Street, 16th Floor

19           PO Box 1347

20           Wilmington, DE 19899

21           rsmith@morrisnichols.com

22           302-351-9205

23

24

Page 4

1            A P P E A R A N C E S (Cont'd)

2    ON BEHALF OF DEFENDANT HONEYWELL INTERNATIONAL, INC.:

3          BENJAMIN PLEUNE, ESQUIRE (by telephone)

4          LAUREN GRIFFIN, ESQUIRE (by telephone)

5          ERIN BEATON, ESQUIRE (by telephone)

6          Alston & Bird

7          Vantage South End, 1120 South Tryon Street,

8          Suite 300

9          Charlotte, NC 20203

10          ben.pleune@alston.com

11          lauren.griffin@alston.com

12          erin.beaton@alston.com

13          704-444-1098

14          704-444-1059

15          704-444-1316

16

17

18

19

20

21

22

23

24

Page 5

1                    E X H I B I T S

2   NO.            DESCRIPTION                    ID/EVD

3                      (None marked.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 19

```
 1   actually in fact met, not merely just pointing to the

 2   claim.

 3               You can take any blue thread, and you

 4   can do exactly what they've done here, and that is

 5   say, okay, the Claim 4 says less than 60 ppm, and so

 6   okay, Honeywell has less than 60 ppm.  I mean, that's

 7   all they've done.

 8               THE COURT:  It seems to me that they

 9   might have Rule 11 problems if they did that.

10               MR. PLEUNE:  Well, you know, that is a

11   question that we may have to address at some point,

12   Your Honor, because quite frankly, we don't believe

13   that we have these low levels.  And I think that they

14   have a real infringement problem here.

15               But you know, now, my client Honeywell

16   is faced with having been dragged into court when they

17   don't believe that there's a sufficient basis and not

18   because there is some actual facts, some real world

19   fact that they can point to that says that this

20   limitation is met because they've essentially cut and

21   paste that limitation into the complaint.

22               THE COURT:  Have you made informal

23   efforts to try to inform them that you don't not

24   infringe and to show them that there are limitations
```

Page 20

1   of the complaint of the patent claims that are not

2   satisfied by your product?

3               MR. PLEUNE:  You know, unfortunately,

4   Your Honor, I would say the time for that has passed,

5   as we've --

6               THE COURT:  Well, no, it hasn't passed.

7   And you can always go to the other party and say, "You

8   know, let's both save a lot of money here.  We can

9   show you.  We can bring you over and show you the

10  numbers.  And our numbers are outside of the

11  limitations of the claim."  You can do that at any

12  point.  So --

13              MR. PLEUNE:  I think --

14              THE COURT:  -- has that been done?

15              MR. PLEUNE:  I apologize.  I was

16  talking over you, Your Honor.

17              THE COURT:  No, it's all right.  I'm

18  just asking, has anything along that line that you say

19  that you've been dragged in and you're going to be

20  dragged through the coals here, but there are ways

21  informally to demonstrated to the other side that they

22  have a misapprehension as to what your product is.

23              And if you can do it, then presumably

24  at that point they -- if you're right and if you can

Page 21

1    convince them, then the case is over.

2                    MR. PLEUNE:  Now, that is absolutely

3    fair, Your Honor.  And probably what I should say is I

4    expect the time for that will come.  To answer your

5    question, no, that has not happened yet.  But

6    certainly from Honeywell's perspective, this was a

7    complaint out of the blue.  And so it's dealing with

8    the current challenge in front of it.

9                    And then I'm sure at some point the

10   parties will discuss the merits of the case --

11                   THE COURT:  Well, I would hope so,

12   because if you're right and you have an ironclad

13   defense against infringement, then that is something

14   that would be in everybody's interest, including the

15   court's interest, for you to resolve with them.  And

16   if you're right, just have a walk-away, some other

17   arrangement.

18                   But I think to say that the filing of

19   the complaint puts you in a position that you're going

20   to have to endure this case all the way through

21   discovery and summary judgment is not necessarily the

22   case.  But anyway, let's move on.  You were saying.

23                   Well, let me just first, you were

24   saying that there have to be specific facts pleaded.

# Exhibit 2

US009506168B2

(12) **United States Patent**
Simmelink et al.

(10) Patent No.: **US 9,506,168 B2**
(45) Date of Patent: **Nov. 29, 2016**

(54) **COLORED SUTURE**

(75) Inventors: **Joseph Arnold Paul Maria J. A. P. M Simmelink**, Cadier en Keer (NL); **Claudia C. Vaz**, Maastricht (NL)

(73) Assignee: **DSM IP ASSETS B.V.**, Heerlen (NL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 875 days.

(21) Appl. No.: **12/599,869**

(22) PCT Filed: **May 23, 2008**

(86) PCT No.: **PCT/EP2008/004135**
§ 371 (c)(1),
(2), (4) Date: **Jan. 14, 2010**

(87) PCT Pub. No.: **WO2008/141835**
PCT Pub. Date: **Nov. 27, 2008**

(65) **Prior Publication Data**
US 2010/0217317 A1    Aug. 26, 2010

(30) **Foreign Application Priority Data**
May 23, 2007    (EP) ..................................... 07010217

(51) **Int. Cl.**
*A61B 17/04*    (2006.01)
*D01F 1/04*    (2006.01)
*A61L 17/04*    (2006.01)
*D01F 6/04*    (2006.01)
*D07B 1/02*    (2006.01)

(52) **U.S. Cl.**
CPC ................ *D01F 1/04* (2013.01); *A61L 17/04* (2013.01); *D01F 6/04* (2013.01); *D07B 1/025* (2013.01); *D07B 2205/2014* (2013.01)

(58) **Field of Classification Search**
CPC ........... A61L 17/04; D01F 1/04; D01F 6/04; D07B 1/025; D07B 2205/2014; D07B 2801/10; C08L 23/06
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,057,040 A | * | 10/1962 | Cuculo | .......................... 428/401 |
| 3,166,073 A | * | 1/1965 | Kronenthal | .................. 606/229 |
| 3,565,652 A | * | 2/1971 | Burnet | .................... 106/166.82 |
| 3,698,853 A | * | 10/1972 | Wilson | ...................... 8/94.11 |
| 4,008,303 A | * | 2/1977 | Glick et al. | .................... 264/78 |
| 5,370,911 A | * | 12/1994 | Throne et al. | ............. 427/469 |
| 5,613,987 A | | 3/1997 | Kuroki et al. | |
| 5,651,377 A | * | 7/1997 | O'Donnell, Jr. | ......... 128/898 |
| 6,060,007 A | * | 5/2000 | Hutton et al. | ................. 264/78 |
| 2003/0050667 A1 | * | 3/2003 | Grafton et al. | ............. 606/228 |
| 2004/0267313 A1 | * | 12/2004 | Amery et al. | ............. 606/228 |
| 2005/0208096 A1 | * | 9/2005 | Shalaby | ........................ 424/423 |
| 2006/0045899 A1 | * | 3/2006 | Sarangapani | ............. 424/405 |
| 2006/0084745 A1 | * | 4/2006 | Kuhn et al. | ................. 524/492 |
| 2006/0263432 A1 | * | 11/2006 | Yano et al. | ................. 424/489 |
| 2007/0154707 A1 | * | 7/2007 | Simmelink et al. | ......... 428/364 |
| 2008/0004702 A1 | * | 1/2008 | Denoziere | ............. 623/17.13 |
| 2008/0027534 A1 | * | 1/2008 | Edwin | .................... A61L 27/16 623/1.44 |
| 2008/0124368 A1 | * | 5/2008 | Sarangapani | ................. 424/405 |
| 2008/0287990 A1 | * | 11/2008 | Smit | ........................ 606/228 |
| 2009/0012251 A1 | * | 1/2009 | Dirks et al. | ................. 526/352 |
| 2009/0048628 A1 | * | 2/2009 | Marissen | ................. 606/231 |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| EP | | 1 306 471 | 5/2003 | |
| EP | | 1 746 187 | 1/2007 | |
| EP | | 1 847 276 | 10/2007 | |
| GB | | 879 069 | 10/1961 | |
| NL | WO 2005066401 A1 | * | 7/2005 | ............ A61L 17/04 |
| WO | | 2004/053212 | 6/2004 | |
| WO | | 2005/066401 | 7/2005 | |

OTHER PUBLICATIONS

International Search Report for PCT/EP2008/004135, mailed Oct. 2, 2008.
Thermoplast® Blue 684, BASF Corourants for Plastics (Oct. 1998).

* cited by examiner

*Primary Examiner* — Gregory Anderson
*Assistant Examiner* — Son Dang
(74) *Attorney, Agent, or Firm* — Nixon & Vanderhye P.C.

(57) **ABSTRACT**

Suture containing filaments of ultra-high molecular weight polyethylene (UHMwPE), characterized in that the suture contains a multi-filament yarn that is obtained by a process comprising the steps of: a) Providing a mixture containing UHMwPE, a spinning solvent and a pigment b) Spinning a multi-filament yarn from the mixture by the gel spinning process.

**12 Claims, No Drawings**

US 9,506,168 B2

1

## COLORED SUTURE

This application is the U.S. national phase of International Application No. PCT/EP2008/004135, filed 23 May 2008, which designated the U.S. and claims priority to European Application No. 07010217.3, filed 23 May 2007, the entire contents of each of which are hereby incorporated by reference.

The invention relates to a colored suture. The coloring of sutures is for example used to make the suture better contrast with the blood or tissue in the operating area. In complicated surgical operations, for example in arthroscopic surgery, when different suture ends are used in a small area, sutures of different color are used to assist surgeons in differing between the suture ends. It is also possible for this reason to combine filaments of different colors in a suture in a certain pattern, to aid surgeons in identifying the travel direction of the suture during surgery, particularly during arthroscopic operations.

Next to coloring is also suture strength an important consideration in selecting filaments for producing a suture. Very strong filaments, at present available for the production of sutures, are filaments of ultra-high molecular weight polyethylene (UHMwPE), produced according to the gel spinning process.

A problem of such filaments is that they are difficult to color. Due to the a-polar character of the UHMwPE a colorant like a dye or a colored coating material adheres poorly to the surface of the filament. If adhesion is insufficient the filaments may loose part or all of the colorant because of the handling during production of the sutures, or may loose part of the colorant in place in the human or animal body, which is undesired because of negative effects on the health. Attempts have been made to enhance the adhesion of colorants to the filaments by giving the filaments a pre-treatment, for example a plasma treatment. Such pre-treatments in general however have an adverse effect on the mechanical properties of the filaments, like for instance the tensile strength and often don't improve adhesion enough to make the filaments suitable to be used in sutures.

In another attempt filaments of UHMwPE were dyed using super critical carbon dioxide as a solvent for the dye, as disclosed in EP-A-0 873 445. In this case the dye penetrated in the body of the filament, so that adhesion problems did no longer play a role. However such a dye shows a tendency to leach out, which is unfavorable for application of the filaments in sutures. Also in U.S. Pat. No. 5,613,987 it was proposed to use a dye to color the UHMwPE filaments. Here the same problems occur.

Polyolefinic filaments, of which polypropylene filaments are the best example, are often colored by the incorporation of a pigment in the polymer composition of the filaments during extrusion of the filaments. In Prog. Polym. Sci. 27 (2002) 853-913 the process for pigmentation of polypropylene filaments is described. The pigments are in a first step uniformly dispersed in a so-called carrier polymer to obtain a concentrated pre-mixture. In order to obtain a sufficient dispersion of the pigment the wetting of the pigment particles must be enhanced by the use of a low viscous carrier polymer and dispersants. A low viscous carrier polymer has a negative influence on mechanical properties of the UHMwPE filaments. Furthermore such filaments have a very low diameter compared to the diameter of polypropylene filaments, so that un-dispersed or re-agglomerated clumps of pigment particles will have a detrimental effect on the tensile strength of the filaments. Therefore it is disadvised in U.S. Pat. No. 5,613,987 to use pigments in UHMwPE filaments.

2

Also the use of dispersants in filaments that are used in sutures is disadvantageous, because such filaments must be biocompatible and dispersants have a negative effect on that.

One solution proposed to overcome the problems of the coloring of filaments of UHMwPE is to combine the filaments in a suture with filaments of a different polymer, preferably nylon, as disclosed in U.S. Pat. No. 7,029,490. Such sutures however have a complicated structure and the nylon filaments only contribute to the strength of the suture at a lower level compared to the filaments of UHMwPE.

Object of the invention is to provide a colored suture, which suture does not show the problems described above.

Surprisingly such a suture is obtained if the suture contains a multi-filament yarn that is obtained by a process comprising the steps of:

a) Providing a mixture containing UHMwPE, a spinning solvent and a pigment

b) Spinning a multi-filament yarn from the mixture by the gel spinning process.

The preparation of filaments of ultra high molecular weight polyethylene (UHMWPE) filaments, prepared by a gel spinning process, is for example described in EP 0205960 A, EP 0213208 A1, U.S. Pat. No. 4,413,110, GB 2042414 A, EP 0200547 B1, EP 0472114 B1, WO 01/73173 A1, and Advanced Fiber Spinning Technology, Ed. T. Nakajima, Woodhead Publ. Ltd (1994), ISBN 1-855-73182-7, and references cited therein. Gel spinning is understood to include at least the steps of spinning filaments from a solution of ultra-high molecular weight polyethylene in a spin solvent; cooling the filament obtained to form a gel filament; removing at least partly the spin solvent from the gel filament; and drawing the filament in at least one drawing step before, during or after removing spin solvent. Suitable spin solvents include for example paraffin's, mineral oil, kerosene or decalin. Spin solvent can be removed by evaporation, by extraction, or by a combination of evaporation and extraction routes. Such filaments are commercially available as Spectra® or Dyneema® grades.

Good results are obtained if the UHMWPE has an intrinsic viscosity (IV, as determined according to method PTC-179 (Hercules Inc. Rev. Apr. 29, 1982) at 135° C. in decalin, with dissolution time of 16 hours, with anti-oxidant DBPC in an amount of 2 g/l solution, and the viscosity at different concentrations extrapolated to zero concentration) of above 5 dl/g. Particularly suitable is UHMWPE with IV of between about 8 and 40 dl/g, more preferably between 10 and 30, even more preferably between 12 and 28, most preferably between 15 and 25 dl/g. These ranges represent an optimum in polymer processability and filament properties. Intrinsic viscosity is a measure for molar mass (also called molecular weight) that can more easily be determined than actual molar mass parameters like $M_n$ and $M_w$. There are several empirical relations between IV and $M_w$, but such relation is highly dependent on molar mass distribution. Based on the equation $M_w = 5.37 \times 10^4 \, [IV]^{1.37}$ (see EP 0504954 A1) an IV of 8 dl/g would be equivalent to Mw of about 930 kg/mol.

Preferably, the UHMWPE is a linear polyethylene with less than one branch per 100 carbon atoms, and preferably less than one side chain per 300 carbon atoms, a branch usually containing at least 10 carbon atoms. The linear polyethylene may further contain up to 5 mol % of one or more comonomers, such as alkenes like propylene, butene, pentene, 4-methylpentene or octene.

In a preferred embodiment, the UHMWPE contains a small amount of relatively small groups as side chains, preferably a C1-C4 alkyl group. It is found that a filament from UHMWPE with a certain amount of such groups show

US 9,506,168 B2

3

reduced creep behaviour. Too large a side chain, or too high an amount of side chains, however, negatively affects the processing and especially the drawing behaviour of the filaments. For this reason, the UHMWPE preferably contains methyl or ethyl side chains, more preferably methyl side chains. The UHMWPE therefore contains preferably at least 0.2, more preferably at least, still more preferably at least 0.3, still more preferably at least 0.4, most preferably at least 0.5 methyl or ethyl side chains. The amount of side chains is preferably at most 20, more preferably at most 10 per 1000 carbon atoms.

The UHMwPE can be a single polymer grade, but also a mixture of two or more different grades, e.g. differing in IV or molar mass distribution, and/or number of side chains. Preferably the polymeric part of the filaments is a single grade UHMwPE.

The number of filaments in the multi-filament yarn may be between 10 and 1000. Preferably the number of filaments in the multi-filament yarn is more than 20, more preferably more than 30.

The mixture containing the UHMwPE, the spinning solvent and the pigment may be provided at different stages in the gel spinning process. It is for example possible to produce in a first step a dry mixture of UHMwPE powder and the pigment, to produce in a second step a slurry of that mixture in a spinning solvent, to dissolve the UHMwPE in the spinning solvent in a third step to obtain a slurry of the pigment in a solution of UHMwPE in the spinning solvent and to spin the multi-filament yarn from that solution. It is also possible to produce a solution of UHMwPE in the spinning solvent first and to add the pigment to that solution.

The UHMwPE filaments preferably contain less than 800 ppm of residual amounts of spin solvent, more preferably less than 500, even more preferably less than 250, most preferably less than 100 ppm; such as less than 80 ppm, or less than 60 ppm. Filaments and suture with low residual amount of spin solvent is highly advantageous in being more suitable for implantation.

Suitable pigments include organic and inorganic pigments. Examples of organic pigments include azo-pigments and phtalo-pigments. Good results are obtained with C.I. Vat brown I and C.I. Solvent Yellow 18. Examples of inorganic pigments include pigments containing titanium dioxide, iron oxides and chromium oxides. Good results are obtained with aluminium-chromium-cobalt oxide, since a suture with good mechanical properties and a low degree of leaching out is obtained.

The amount of pigment used may be between 0.1-7 wt. % of the final filament, as used for the production of the suture. Preferably the final filament contains at least 0.3 wt. %, more preferably at least 0.5 wt. % even more preferably at least 0.7 wt. % of pigment. Preferably the final filament contains at most 5.0 wt. %, more preferably at most 3 wt. % of pigment, even more preferably at most 2.5 wt. %, most preferably at most 2 wt. %. This is in view of obtaining a bright colour and good mechanical properties.

The UHMwPE filaments in the suture according to the invention consist preferably of UHMwPE, the pigment and less than 1000 ppm of further constituents, preferably less than 500 ppm of further constituents, more preferably less than 200 ppm of further constituents, most preferably less than 100 ppm of further constituents, such as less than 80 ppm, or less than 60 ppm.

A suitable size for the suture according to the invention may be in the full USP range for sutures (e.g. 12-0 to 10). A USP value of 10 corresponds with a maximum diameter of 1.3 mm. In one preferred embodiment the suture member

4

has a titer of between 25 and 500 dtex. In that case the suture is very suitable for cardiovascular operations. In another preferred embodiment the suture has a titer of between 500 and 3000 dtex. In that case the suture is very suitable for use in orthopedic applications. In yet another preferred embodiment the suture has a titer of between 3000 and 9000 dtex. In that case the suture is very suitable to be used in heavy orthopedic applications.

The suture may in addition to the ultra high molecular polyolefin filaments comprise further components, for example compounds that provide some functional effect, like anti-microbial or anti-inflammatory action, or that further improve knotting performance. The amount of such other components is generally limited to at most 20 mass % (relative to total cable mass), preferably at most 10, more preferably at most 5 mass %.

The suture according to the invention comprises preferably at least 50 mass % of the ultra high molecular weight polyolefin filaments. The ultra high molecular weight polyolefin filaments contribute most to the strength properties of the member. Furthermore the filaments enhance the sliding properties of the suture through tissue. Therefore more preferably the suture comprises at least 60 mass % of the ultra high molecular weight polyolefin filaments, more preferably at least 70, 80 or at least 90 mass %. The suture may further comprise other fibres, e.g. other biocompatible materials like polymers, to provide some other additional properties to the suture, including improved knot slip behaviour or visual contrast. Such other fibres may be present in the form of one or more strands in the suture. However, preferably each strand has the same composition, so that each strand comprises the same amount of the polyolefin filaments and of the other filaments. This ensures that the suture has a homogeneous structure.

Suitable examples of other fibrous materials include filaments or staple fibres made from non-absorbable polymers like other polyolefin's, fluoro-polymers, or semi-aromatic polyesters like polyethylene terephthalate, absorbable polymers like aliphatic polyesters based on e.g. lactides.

Most preferably the suture consists of the polyolefin filaments. The invention also relates to the use of the suture according to the invention in surgical method.

The invention is further explained in the examples, without being limited to the examples.

Methods

Intrinsic Viscosity.

The Intrinsic Viscosity (IV) is determined according to method PTC-179 (Hercules Inc. Rev. Apr. 29, 1982) at 135° C. in decalin, the dissolution time being 16 hours, with DBPC as anti-oxidant in an amount of 2 g/l solution, by extrapolating the viscosity as measured at different concentrations to zero concentration;

Tensile Properties.

Tensile properties: tenacity, tensile modulus (or modulus) and elongation at break (or eab) are defined and determined on multifilament yarns with a procedure in accordance with ASTM D885M, using a nominal gauge length of the fibre of 500 mm, a crosshead speed of 50%/min and Instron 2714 clamps, of type Fibre Grip D5618C. On the basis of the measured stress-strain curve the modulus is determined as the gradient between 0.3 and 1% strain. For calculation of the modulus and strength, the tensile forces measured are divided by the titre, as determined by weighing 10 meters of fibre; values in GPa are calculated assuming a density of 0.97 g/cm$^3$;

US 9,506,168 B2

5

Leaching Tests

According to the requirements of ISO 10993-12:2002(E) an extraction was performed with samples of multi-filament yarn in both polar (distilled water) and non-polar (cotton-seed oil) solvents. The extraction conditions were 37° C. for 24 and 72 hours.

After dilution with acetonitrile, the different phases were analyzed on the presence of pigment using Liquid Chromatography-Mass Spectrometry (LC-MS) and Gas Chromatography-Mass Spectrometry (GC-MS). In case no leaching I was observed means that leaching was lower than 10 ppb.

Cytotoxicity.

Cytotoxicity tests were performed according to ISO 10993-5, 1999: Biological Evaluation of Medical Devices—Part 5: Tests for in vitro cytotoxicity. The biological reactivity of a mammalian monolayer, L929 mouse fibroblast cell culture, in response to the test item extracts (samples containing up to 2.0 wt. % pigment) was determined. Extracts were prepared at 37° C. (±1) for 24 hours in a humidified atmosphere containing 5±1% $CO_2$. Positive (natural rubber) and negative (silicone) control articles were prepared to verify the proper functioning of the test system. The maintenance medium of the cell cultures was replaced by the extracts of the tests item or control article in triplicate and the cultures incubated for 48 hours, at 37° C. (±1). Biological reactivity was rated on the following scale:

grade 0 (no reactivity)
grade 1 (slight reactivity)
grade 2 (mild reactivity)
grade 3 (moderate reactivity)
grade 4 (severe reactivity)

EXAMPLES 1-4

Slurries containing decalin, 6 mass % of powder of UHMwPE having an IV of 14 and 0.5, 1, 1.5 respectively 2 wt. % of aluminum-chromium-cobalt oxide pigment (of the cations is 32.5% Co, 32% Al and 35.5 Cr) were prepared in a mixer.

The slurries were fed to a twin screw extruder having a diameter of 25 mm, being equipped with a gear-pump at a temperature setting of 180° C. In the extruder the UHMwPE was dissolved in the decalin and the so obtained mixture of the UHMwPE dissolved in the decalin and the pigment was extruded through a spin plate having 24 spin holes into a nitrogen atmosphere with a rate of 1.0 g/min per hole. The so obtained solution filaments were cooled in a water bath kept at about 35° C. and with a water flow rate of about 5 cm/s perpendicular to the filaments entering the bath, and taken-up at such rate that a draw ratio of 15 was applied to the as-spun filaments in the air-gap of 15 mm. The filaments subsequently entered an oven at 130° C. The filaments were further stretched, during which process the decalin evapo-

6

rated from the filaments. After the stretching process the filaments were kept taut in an oxygen free environment for 24 hours at 100° C.

Mechanical properties, leaching out and cytotoxicity were determined on the so obtained multi-filament yarns.

The mechanical properties are reported in table 1. Favourable mechanical properties were obtained.

No compounds related to pigment, or other unknown compounds, where found. The pigment <10 µg/kg (<10 ppb).

From these results it can be concluded that the bio-availability of pigment due to leaching from sutures according to the invention containing the multi-filament yarn is negligible.

All the extracts of the colored samples when submitted to the cytotoxicity test exhibited no reactivity (grade 0) by the cell cultures. Severe reactivity (grade 4) was observed for the positive control article. The negative control article showed no signs of reactivity (grade 0). Therefore it can be concluded that sutures according to the invention containing the multi-filament yarn are non-cytotoxic.

The yarns furthermore show a homogeneous and bright colour.

Comparative Test A.

Multi-filament yarn was produced according to examples 1-4, however no pigment was used.

The multi-filament yarn was dyed with D&C blue No 6 (delivered by Sigma Aldrich of the USA) by placing the multi-filament yarn for 7 hours at 120° C. in a solution of the dye in super-critical carbon dioxide.

The resulting yarns presented a non-homogeneous color distribution pattern.

Mechanical properties and leaching out were determined.

Mechanical properties are reported in table 1. A serious decline in mechanical properties was observed (tenacity decreased about 40%).

Considerable leaching out took place in coconut oil as was already clear from the disappearing color of the multi-filament yarn.

From these results it is clear that sutures containing the multi-filament yarn according to comparative test A are not suitable for use in surgery.

Comparative Test B.

Multi-filament yarn was produced according to examples 1-4, however no pigment was used.

The multi-filament yarn was dip-coated with a polyurethane coating containing an azo-dye (Sudan Red D, delivered by Sigma Aldrich).

Test data of the multi-filament yarn were measured and reported in table I. It is clear that considerable leaching out took place and that the cyto-toxicity of the filaments is insufficient. Therefore sutures containing the multi-filament yarn according to comparative test B are not suitable for use in surgery.

TABLE 1

| Example/ Xomp. exp. | Tenacity [cN/dTex] | Modulus [cN/dTex] | Eab [%] | leaching [—] | cytotox. [—] | colouring [—] |
|---|---|---|---|---|---|---|
| I | 37 | 1439 | 2.8 | No | 0 | homogeneous |
| II | 37 | 1377 | 2.9 | No | 0 | Homogeneous |
| III | 40 | 1501 | 3.0 | No | 0 | Homogeneous |
| IV | 37 | 1414 | 2.9 | No | 0 | Homogeneous |
| A | 21 | — | — | Yes | — | Inhomogeneous |
| B | 37 | 1381 | 2.8 | Yes | — | Inhomogeneous |

US 9,506,168 B2

7

8

The invention claimed is:

**1**. A colored suture consisting of multi-filamentary yarn and at most 20 mass % of other components, wherein at least 50 mass % of the yarn consists of colored gel-spun filaments obtained by spinning a mixture containing ultra-high molecular weight polyethylene (UHMwPE) having an intrinsic viscosity (IV) of between about 8 and 40 dl/g, a spin solvent and a pigment, wherein the colored filaments consists of UHMwPE, between 0.1 and 7.0 wt. % of an inorganic chromium oxide-containing pigment, a residual amount of less than about 100 ppm of the spin solvent, and less than 1000 ppm of further constituents.

**2**. The colored suture according to claim **1**, wherein the amount of the inorganic pigment present in the filaments of the suture is between 0.3 wt. % and 5.0 wt. %.

**3**. The colored suture according to claim **1** or **2**, wherein the amount of the inorganic pigment present in the filaments of the suture is lower than 2.0 wt. %.

**4**. The colored suture according to claim **1**, wherein the inorganic pigment is aluminum-chromium-cobalt oxide.

**5**. The colored suture according to claim **1**, wherein the filaments contain a residual amount of less than 60 ppm of the spin solvent.

**6**. The colored suture according to claim **1**, wherein the filaments contain less than 500 ppm of further constituents.

**7**. The colored suture according to claim **1**, wherein the filaments contain less than 200 ppm of further constituents.

**8**. The colored suture according to claim **1**, wherein at least 60 mass % of the yarn consists of said gel-spun filaments.

**9**. The colored suture according to claim **1**, wherein at least 90 mass % of the yarn consists of said gel-spun filaments.

**10**. The colored suture according to claim **1**, wherein the suture consists of the at least one multi-filamentary yarn and at most 10 mass % of other components.

**11**. The colored suture according to claim **1**, wherein the suture consists of the at least one multi-filamentary yarn and at most 5 mass % of other components.

**12**. The colored suture according to claim **1**, wherein the suture consists of said gel-spun filaments.

*  *  *  *  *