## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DSM IP ASSETS, B.V.; DSM PURITY, B.V.; DSM BIOMEDICAL, B.V.; & DSM BIOMEDICAL, INC., | § § § § | |
| *Plaintiffs,* | § § | Civil Action No. 23-675-WCB |
| v. | § § | |
| HONEYWELL INTERNATIONAL, INC., | § § | |
| *Defendant.* | § § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff DSM IP Assets, B.V. ("DSM") owns U.S. Patent No. 10,280,532 ("the '532 patent"), which is directed to a colored multi-filament yarn used to make medical sutures. The claimed yarn is made by gel spinning a mixture containing ultra-high molecular weight polyethylene ("UHMWPE") of a designated viscosity along with certain other components, which are combined to produce filaments that satisfy certain designated characteristics. Together with several related corporate entities (DSM Purity B.V.; DSM Biomedical B.V.; and DSM Biomedical, Inc.), DSM brought this action against defendant Honeywell International, Inc. ("Honeywell"), alleging that Honeywell had infringed the '532 patent by making and selling colored multi-filament yarns falling within the scope of the asserted claims.

Honeywell answered by denying the infringement claim, Dkt. No. 30 at 6–8, asserting various defenses, including noninfringement, *id.* at 9–12, and filing a counterclaim seeking a declaratory judgment of noninfringement, *id.* at 25–25. That counterclaim was denominated the First Counterclaim. In addition, Honeywell filed five other counterclaims, denominated the Second through the Sixth Counterclaims. In the Second Counterclaim, Honeywell asserted that

DSM had "monopolized and engaged in activities with the specific intent to monopolize the market for UHMWPE blue fiber" in the United States and Europe.  Honeywell further contended that DSM has attempted to maintain its monopoly "by asserting knowingly baseless claims of patent infringement with the intent that those claims would hinder competition in the UHMWPE blue fiber market."  *Id.* at 25.  In the remaining four counterclaims, Honeywell alleged that DSM had violated various state law prohibitions on unfair competition, unfair trade practices, and tortious interference with prospective business relations and economic advantage.  *Id.* at 25–31.

DSM has now moved to dismiss all of Honeywell's counterclaims on various grounds.  In the alternative, DSM asks the court to stay Honeywell's Second through Sixth Counterclaims pending the disposition of DSM's patent infringement claim.

The motion to dismiss the counterclaims will be denied.  However, because it will be clearly more efficient to resolve DSM's patent infringement claim before addressing Honeywell's counterclaims charging DSM with federal antitrust and state law tort violations, the court will order that the proceedings as to the patent claims (including Honeywell's First Counterclaim) be tried separately from the antitrust and state law claims (Honeywell's Second through Sixth Counterclaims), and that all proceedings relating to Honeywell's Second through Sixth Counterclaims will be stayed until after the proceedings relating to DSM's patent infringement claim and Honeywell's corresponding First Counterclaim have been resolved.

## I. The First Counterclaim

In its First Counterclaim, Honeywell seeks a declaratory judgment of noninfringement. DSM has moved to dismiss that counterclaim on two grounds: (1) that the counterclaim "only mirrors DSM's direct-infringement claim"; and (2) that the counterclaim consists of a "mere conclusory statement" and a "formulaic recitation" of the cause of action's elements, which is

insufficient to satisfy the "plausibility" pleading standard set forth by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Dkt. No. 46 at 10-11.

Neither ground is persuasive.  As to the first ground, counterclaims of non-infringement in patent cases are commonplace, even when they appear to do no more than mirror the corresponding allegations of infringement in the complaint.  Courts have frequently rejected arguments that such counterclaims should be dismissed as duplicative because they purportedly serve no purpose beyond that served by the accused infringer's answer denying infringement.  As the courts have noted, however, asserting an affirmative claim of noninfringement in a counterclaim has a use not served by the mere denial of infringement in an answer or in an affirmative defense.  Because a counterclaim of noninfringement, unlike an answer or an affirmative defense, survives the dismissal of a plaintiff's claim of infringement, a counterclaim of noninfringement serves to avoid the possibility that the defendant would lose its right to an adjudication of the infringement issue if the plaintiff abandoned its infringement claim.  *See Eagle Eyes Traffic Indus. USA Holding v. AJP Distributors Inc.*, No. 2:18-cv-1583, 2018 WL 4859260, at *2–3 (C.D. Cal. June 22, 2018) (citing cases).

It may well be in a defendant's interest to preserve the right to a binding adjudication of noninfringement in such situations, so as to protect against a later assertion of infringement of the same or similar claims.  If the defendant has asserted noninfringement only as a defense, the defendant has no guarantee that it will be able to obtain such an adjudication of noninfringement, even if the defendant needs such a decision to forestall possible future infringement charges.  In that setting, as the court in the *Eagle Eyes* case explained, "a counterclaim of non-infringement

serves as a procedural safeguard for a defendant accused of infringement," and dismissal would not be warranted. *Id.* at *3.

Based on that reasoning, courts have held that if the noninfringement counterclaim serves a purpose not fully served by the defense of noninfringement, the counterclaim should not be dismissed. Thus, a noninfringement counterclaim will not be dismissed as duplicative where it serves "the purpose of allowing the accused infringer to continue seeking a declaration of non-infringement even should the plaintiff voluntarily dismiss its infringement action." *Viavi Sols. Inc. v. Platinum Optics Tech. Inc.*, No. 5:20-cv-5501, 2023 WL 323896, at *4 (N.D. Cal. May 2, 2023) (citing *Fitness Anywhere LLC v. Woss Enters. LLC*, No. 14-CV-1725, 2014 WL 4802432, at *3 (N.D. Cal. Sept. 26, 2014)); *see also Nouis Techs. Inc. v. Polaris Indus. Inc.*, No. 14-cv-233, 2015 WL 3407862, at *3 (W.D. Wis. May 27, 2015); *DeLage Landen Fin. Servs., Inc. v. Miramax Film Corp.*, No. 06-2319, 2009 WL 678625, at *6 (E.D. Pa. Mar. 16, 2009); *Kvaerner U.S. Inc v. Kemper Envt'l Ltd.*, No. 06-403, 2006 WL 3064104, at *3 (W.D. Pa. Oct. 26, 2006) ("[T]he declaratory judgment [counterclaim] gives the [defendants] the ability to have the Court rule on these issues if, for example, the plaintiff were to voluntarily dismiss the claim."). Because the First Counterclaim serves that purpose in this case, DSM's redundancy argument for dismissal is unconvincing.

DSM's second ground for dismissing the First Counterclaim is that Honeywell's allegations of noninfringement are insufficient to withstand DSM's motion to dismiss under conventional pleading standards. The same pleading standards from *Iqbal* and *Twombly* that apply to claims are equally applicable to counterclaims. *IOENGINE, LLC v. PayPal Holdings, Inc.*, No. 18-452, 2019 WL 2121395, at *2 (D. Del. May 15, 2019) ("Courts use the same standard in ruling on a motion to dismiss a counterclaim under Rule 12(b)(6) as they do in assessing a claim in a

4

complaint.") (quoting *Princeton Digital Image Corp. v. Konami Digital Ent. Inc.*, No. 12-1461, 2017 WL 239326, at *5 n.12 (D. Del. Jan. 19, 2017)); *Goddard Sys., Inc. v. Gondal*, No. 17-1003, 2018 WL 1513018, at *4 (D. Del. Mar. 27, 2018) (same); *Tonal Sys., Inc. v. ICON Health & Fitness, Inc.*, No. 20-1197, 2021 WL 1785072, at *2 (D. Del. May 5, 2021) (same); *Security Profiling, LLC v. Trend Micro Am., Inc.*, No. 6:16-DV-1165, 2017 WL 5150682, at *4 (E.D. Tex. Mar. 21, 2017) (same).   Contrary to DSM's assertion, however, the allegations in Honeywell's First Counterclaim and in the accompanying text of Honeywell's "Answer to Plaintiffs' Complaint, Defenses, and Counterclaims," Dkt. No. 30, are sufficient to satisfy the *Iqbal* and *Twombly* pleading standards.

With respect to the issue of infringement, Honeywell's pleading is not limited to a "formulaic recitation" of the elements of infringement or a "mere conclusory statement" that Honeywell does not infringe the '532 patent, as DSM contends.   Instead, Honeywell identifies the grounds for its noninfringement allegations with at least some specificity.   In particular, Honeywell notes that during prosecution of the '532 patent, DSM had to add certain limitations in order to avoid the prior art and obtain the patent.   Those limitations were to a multi-filament yarn containing (1) UHMWPE of a specific intrinsic viscosity, (2) a specific weight to an inorganic chromium oxide-containing pigment, (3) a residual spin solvent of less than about 500 parts per million, and (4) less than 1000 parts per million of other constituents.   *See* Dkt. No. 30, at 13.   Honeywell asserts that its SPECTRA BIO Blue products "do not include the specific limitations of the claims that DSM had to add during the prosecution of its patent at the PTO in order to avoid the disclosure of the prior art identified by the USPTO."   Dkt. No. 30 at 13; *see also id.* at 17.   Honeywell denies that it makes, uses, sells, or offers to sell "[a] colored multi-filament yarn comprising filaments that have been obtained by gel spinning a mixture containing ultra-high molecular weight

polyethylene (UHMwPE) having an intrinsic viscosity (IV) of between about 8 and 40 dl/g, a spin solvent and a pigment, wherein the filaments consist of UHMwPE, between 0.1 and 7.0 wt. % of an inorganic chromium oxide-containing pigment, a residual amount of spin solvent of less than about 500 ppm, and less than 1000 ppm of further constituents." *Id.* at 24; *see also id.* at 18.

Honeywell thus identifies particular limitations that its product does not satisfy. Although that representation is part of Honeywell's overall legal assertion of noninfringement, it is sufficiently factual in nature to go beyond simply setting forth a barebones legal conclusion that Honeywell's product does not infringe. To be sure, Honeywell's allegations could have been even more specific.[1] However, given that the "plausibility" standard is not an exacting one, Honeywell's references to the particular limitations that are assertedly missing from its product constitute sufficiently specific allegations of fact in support of Honeywell's denial of infringement to satisfy the pleading standards set forth in *Twombly* and *Iqbal*.

## II. The Second Through Sixth Counterclaims

The theme of Honeywell's Second through Sixth Counterclaims is that DSM's patent infringement action is meritless and that the action was not brought for the purpose of enforcing

---

[1] In this case, as in others, the line between factual allegations and legal conclusions is not a sharp one. If Honeywell had asserted, for example, that it uses UHMWPE having an intrinsic viscosity lower than the 8 dl/g level recited in the asserted claims, that allegation would clearly be factual in nature. On the other hand, if Honeywell simply asserted that it did not infringe because its product did not satisfy the imitations of any of the asserted claims, that allegation would be deemed a legal conclusion. By identifying particular limitations that its products did not satisfy, Honeywell's allegations fall between those extremes. Honeywell's denial that its product contains certain identified features in the claim limitations, however, renders its allegations more factual than legal in nature. Honeywell's allegations therefore satisfied the requirement that its pleading identify "factual allegations [sufficient] to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and that the pleading contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

DSM's legitimate patent rights, but rather to interfere with Honeywell's lawful right to sell products that compete with DSM's UHMWPE fibers.

The Second Counterclaim asserts a claim of monopolization, in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. Honeywell alleges that DSM "has monopolized and engaged in activities with the specific intent to monopolize the market for UHMWPE blue fiber" and that DSM "has attempted to maintain its monopoly by asserting knowingly baseless claims of patent infringement with the intent that those claims would hinder competition in the UHMWPE blue fiber market." Dkt. No. 30 at 25. With respect to the latter allegations, Honeywell asserts that "no reasonable litigant could realistically allege infringement or expect success on the merits" of DSM's patent infringement claim," and that DSM "brought this lawsuit not for a legitimate purpose of enforcing patent rights but to suppress competition in the UHMWPE blue fiber market and maintain its monopoly power." *Id.* DSM's conduct, according to Honeywell, is "harming Honeywell in the form of damage to the reputation of Honeywell's business and products, lost profits, lost business opportunities, and attorneys' fees incurred in conjunction with defendant against DSM's sham allegations of patent infringement." *Id.* at 25–26.

In addition to its counterclaim alleging an antitrust violation, Honeywell alleges that DSM has engaged in unfair competition under Delaware law (Third Counterclaim), Unfair Trade Practices under North Carolina law (Fourth Counterclaim), Tortious Interference with Prospective Business Relations under Delaware law (Fifth Counterclaim), and Tortious Interference with Prospective Economic Advantage under North Carolina law (Sixth Counterclaim). Like the antitrust counterclaim, each of those other counterclaims is based on the allegation that DSM has improperly asserted that Honeywell has infringed DSM's '532 patent, even though DSM allegedly knew or should have known that the '532 patent was not infringed, and that DSM has used the fact

7

of the pending patent infringement action to dissuade customers from purchasing Honeywell's blue UHMWPE fiber products. *Id.* at 26–31.

This general scenario has arisen frequently in patent litigation. In a number of instances, defendants have characterized patent infringement actions such as DSM's as constituting "sham litigation," i.e., actions brought not to vindicate legitimate patent rights, but to maintain market power by discouraging potential competitors from competing with the patentholder. In this case, Honeywell contends that DSM has engaged in anti-competitive conduct not only by suing Honeywell for patent infringement, but also by contacting Honeywell's potential customers and advising them of the patent infringement action, thereby discouraging them from purchasing products from Honeywell that are the subjects of the patent infringement action. Dkt. No. 30 at 13–14. 18–20.

In support of its right to seek a remedy under the patent laws, DSM invokes the so-called *Noerr-Pennington* doctrine. That doctrine provides broad protection for parties seeking judicial relief from the courts against claims that those parties' legal actions violate the antitrust laws or other laws protecting against anti-competitive conduct.

In this case, as in many others of this kind, parties that have been sued for infringement of intellectual property rights have responded by asserting that the lawsuits constitute "sham litigation" that is not brought in a good faith effort to enforce intellectual property rights, but as an illegitimate means of suppressing competition. Parties claiming such sham litigation have frequently asserted that the litigation violates antitrust laws or other legal protections directed at anticompetitive conduct, such as laws governing unfair trade practices.

Applying the *Noerr-Pennington* doctrine, courts have held that parties asserting claims of anticompetitive sham litigation must meet a high standard in order to prevail: They must establish

that the alleged sham litigation was objectively baseless and that the party bringing the litigation knew its claims were meritless.  The Supreme Court applied that two-part test in the context of a copyright infringement action in *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993).  Following suit, the Federal Circuit has consistently applied that two-part test to sham litigation claims in the patent infringement context.  In *Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*, 762 F.3d 1338 (Fed. Cir. 2014), the court explained the governing principle as follows:

> A party is ordinarily exempt from antitrust liability for bringing a lawsuit against a competitor.  That principle is known as "*Noerr-Pennington* immunity," because it originated with the Supreme Court's decisions in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).  There is a recognized exception to *Noerr-Pennington* immunity for "sham litigation," which the Supreme Court has defined as litigation that (1) is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" (the objective element), and (2) is motivated by a desire "to interfere *directly* with the business relationships of a competitor" (the subjective element).

*Id.* at 1343.

The issues to be decided in assessing a claim for infringement of a particular patent overlap considerably with the issues to be decided in assessing a claim of sham litigation based on that patent.  The question whether the patent infringement claim is meritless requires much the same inquiry that is involved in determining whether there is patent infringement.  And the strength of the infringement claim is clearly relevant to an inquiry into the patentee's subjective beliefs.  For that reason, it is likely that resolution of the patent infringement claim will significantly simplify the claims arising from the sham litigation allegation and may even moot those claims altogether.  A decision that the patent has been infringed, for example, would effectively dispose of any claim that the infringement theory was baseless.

Because resolution of the patent infringement issue in such cases is likely to significantly simplify resolution of the sham-litigation-based claims, and because antitrust claims are notoriously complex and typically involve expensive discovery, courts have frequently separated the antitrust and unfair competition counterclaims from the patent claims in such cases and stayed the antitrust and unfair competition counterclaims pending the resolution of the patent infringement claims.  *See, e.g., In re Innotron Diagnostics*, 800 F.2d 1077, 1084 (Fed. Cir. 1986) (referring to "the now-standard practice of separating for trial patent issues and those raised in an antitrust counterclaim"; noting that the plaintiff had cited 23 cases in which antitrust counterclaims filed in response to patent infringement claims were separated from the patent claims for trial).[2]

Courts in this district have on many occasions followed this practice and stayed sham-litigation-based claims while addressing the related patent infringement claims.  *See, e.g.*, *Westinghouse Air Brake Techs. Corp. v. Siemens Mobility, Inc.*, 330 F.R.D. 143 (D. Del. 2019); *Eagle Pharms., Inc. v. Eli Lilly & Co.*, No. 18-1121, 2018 WL 6201704, at *2 (D. Del. Nov. 27, 2018); *Orthophoenix, LLC v. Dfine, Inc.*, No. 13-1003, 2015 WL 1938702, at *1 (D. Del. Apr. 28, 2015); *Intellectual Ventures I LLC v. Toshiba Corp.*, No. 13-453, 2015 WL 1476708, at *1 (D. Del. Mar. 20, 2015); *Apotex, Inc. v. Senju Pharm. Co.*, 921 F. Supp. 2d 308, 313 (D. Del. 2013); *Eurand Inc. v. Mylan Pharms Inc.*, No. 08-889, 2009 WL 3172197, at *2 (D. Del. Oct. 1, 2009);

---

[2]  Ordering separate trials in such situations is authorized by Rule 42(b) of the Federal Rules of Civil Procedure, which permits district courts to order separate trials for "convenience, to avoid prejudice, or to expedite and economize."  Ordering separate trials under Rule 42(b) is sometimes referred to as bifurcation, which is accurate, and sometimes referred to as severance, which is not.  The latter term is more properly reserved for orders entered pursuant to Fed. R. Civ. P. 21, which authorizes courts to "sever" claims in cases such as when there has been misjoinder.  As explained by Wright and Miller, "[s]eparate trial of claims originally sued upon together usually will result in the entry of one judgment, but severed claims become entirely independent actions to be tried, and judgment entered thereon, independently."  9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* §2387, at 87 (2008); *see also Innotron*, 800 F.2d at 1079 n.1; *Gaffney v. Riverboat Servs. Of Indiana, Inc.*, 451 F.3d 424, 442 (7th Cir. 2006).

*Monsanto Co. v. Syngenta Seeds, Inc.*, No. 04-305, 2006 WL 7204491, at *1 (D. Del.  Nov. 8, 2006).

Courts in other districts also frequently order separate trials in such cases and stay the antitrust claims pending the resolution of related patent infringement claims.  *See, e.g.*, *Complete Genomics, Inc. v. Illumina, Inc.*, No. 21-cv-217, 2021 WL 1197096 (N.D. Cal. Mar. 30, 2021); *Fresenius Kabi USA, LLC v. Fera Pharms., LLC*, No. 15-3654, 2017 WL 2213123 (D.N.J. Mar. 19, 2017); *Fitbit, Inc. v. Aliphcom*, 2016 WL 7888033 (N.D. Cal. May 27, 2016); *Otsuka Pharm. Co. v. Apotex*, 143 F. Supp. 3d 188 (D.N.J. Aug. 11, 2015); *Shire LLC v. Mickle*, No. 7:10-cv-434, 2011 WL 2959461 (W.D. Va. July 15, 2011); *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, No. 1:CV-09-1685, 2011 WL 1627052 (M.D. Pa. Apr. 29, 2011); *Mitsubishi Heavy Indus., Ltd. v. Gen. Elec. Co.*, 720 F. Supp. 2d 1061 (W.D. Ark. 2010); *Seiko Epson Corp. v. Glory S. Software Mfg., Inc.*, No. 06-CV-477, 2010 WL 256505 (D. Ore. Jan. 19, 2010); *Monsanto Co. v. E.I. DuPont de Nemours & Co.*, No. 4:09CV686, 2009 WL 3012584 (E.D. Mo. Sept. 16, 2009); *Square D Co. v. E.I. Elecs, Inc.*, No. 06 C 5079, 2009 WL 136177 (N.D. Ill. Jan. 15, 2009); *Abraxis Bioscience, Inc. v. Navinta LLC*, No. 07-1251, 2008 WL 2967034 (D.N.J. July 31, 2008).

That course is appropriate here.  The issue of whether Honeywell's products infringe the '532 patent appears to be a straightforward one that may be capable of resolution on summary judgment.  The counterclaims, which at this juncture seem likely to present questions not necessarily amenable to summary disposition, may become much simpler to resolve once the patent infringement issue is settled.  In the interest of judicial efficiency, staying the antitrust and unfair competition counterclaims (the Second through Sixth Counterclaims) is clearly preferable to attempting to adjudicate both the infringement claim and the counterclaims at the same time

and, potentially, before the same jury.   And allowing discovery relating to the antitrust counterclaim to go forward at this juncture would add significantly to the expense and delay in resolving the action, given the complexity typically associated with antitrust discovery.   *See Westinghouse Air Brake Techs.*, 330 F.R.D. at 149–50; *Eagle Pharms.*, 2018 WL 6201704, at *3; *Orthophoenix*, 2015 WL 1938702, at *1.

For those reasons, the court will exercise its discretion to order that the patent claims (including Honeywell's First Counterclaim) be tried separately from the remaining counterclaims and that all proceedings related to Honeywell's Second through Sixth Counterclaims, including discovery, be stayed while the parties litigate the merits of the patent infringement dispute. Honeywell's Second Through Sixth Counterclaims will be addressed after the patent claims are resolved.

Because proceedings on the counterclaims are being stayed, it is unnecessary at this point to address DSM's arguments that Honeywell has not shown that it has suffered antitrust injury and thus lacks standing to pursue its antitrust counterclaim.   It is also unnecessary to address DSM's contention that Honeywell has not alleged but-for causation attributable to the alleged antitrust violation for any injury Honeywell may have suffered.

IT IS SO ORDERED.

SIGNED this 15th day of February, 2024.


WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

12